UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| GOMBA MUSIC INC. and HARRY BALK, <br><br>     Plaintiffs, <br><br> v. <br><br> CLARENCE AVANT and INTERIOR MUSIC CORP., <br><br>     Defendants. | |
| INTERIOR MUSIC CORP., <br><br>     Third-Party Plaintiff, <br><br> v. <br><br> SIXTO RODRIGUEZ, <br><br>     Third-Party Defendant. | Case No. 14-11767 <br> Honorable Laurie J. Michelson <br> Magistrate Judge R. Steven Whalen |

**OPINION AND ORDER DENYING PLAINTIFF'S MOTION FOR PARTIAL
SUMMARY JUDGMENT [82], GRANTING DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT [83], AND GRANTING IN PART
AND DENYING IN PART THIRD-PARTY DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT [81]**

In the late 1960s, Plaintiff Harry Balk signed a series of contracts to manage, record, and publish music for singer/song-writer Sixto Rodriguez. These contracts gave him the exclusive rights to Rodriguez's songs. Balk claims that while under this exclusive arrangement, Rodriguez conspired with Defendant Clarence Avant to release an album called *Cold Fact* behind Balk's back, falsely attributing authorship of the songs to others. While the album never took off here, it became a hit in South Africa—something unknown even to Rodriguez until many decades later. When the story of the album's success became the feature of the 2012 Oscar-winning

documentary *Searching for Sugarman*, Balk claims he suddenly realized he had been cheated, so he sued Avant to recover the money he lost out on over the years. The problem for Balk is that discovery yielded undisputed evidence that tells a different story: that he did little for Rodriguez and effectively gave up on him, abandoning their arrangement.

Balk and Defendants have both moved for summary judgment on the issues of whether Balk has an ownership interest in the disputed songs that appeared on *Cold Fact* and whether his claims are timely. Third-Party Defendant Rodriguez has also moved for summary judgment on the contract claims that Defendant/Third-Party Plaintiff Interior Music Corp. filed against him. The motions are fully briefed, and the Court heard oral argument on November 21, 2016. For the reasons discussed, the Court will deny Balk's motion, grant Defendants' motion, and grant in part and deny in part Rodriguez's motion.

## I.

This dispute centers on the rights to nine songs composed and performed by Third-Party Defendant Sixto Rodriguez. The songs appeared with several others on the 1970 album *Cold Fact*, a record published by Defendant Clarence Avant's publishing company, Defendant Interior Music Corp. For decades, *Cold Fact* did not take off in the United States. But unknown to Rodriguez, the album became a hit in South Africa—a story featured in the 2012 Oscar-winning documentary *Searching for Sugarman*.[1] The heart of this case is whether Plaintiff Harry Balk, another music industry professional who at one time had an exclusive arrangement with Rodriguez, has the rights to the songs that appeared on *Cold Fact*.

---

[1] The Court makes no findings on the album's purported success (or lack thereof) and mentions these issues only for background purposes, as the parties have not cited evidence on these issues.

**A.**

The story starts over fifty years ago. On July 25, 1966, Sixto Rodriguez entered several agreements with entities related to Balk, including Gomba Music, Inc., Balk's publishing company, (*see* R. 83-5, PID 1490). First, Rodriguez agreed to make Harry Balk Enterprises his personal and exclusive manager. (R. 83-2, PID 1477.) This agreement had a four-year term and gave Balk the option to renew for another two years. (R. 83-2, PID 1477–78.) Rodriguez also entered into a two-year recording contract with Impact Records, which also had a renewal option. (R. 83-3, PID 1480–81.) Finally, Rodriguez entered the agreement critical to this case— an "exclusive writer agreement" with Gomba Music, Inc. (R. 83-4, PID 1483.) This agreement gave Gomba ownership rights to all songs written and composed by Rodriguez during the agreement's 5-year term, including the songs' copyrights. (R. 83-4, PID 1483.)

Little resulted from the relationship between Balk and Rodriguez. For instance, the recording agreement contemplated that Impact would record a minimum of six songs during the contract's two-year term. (R. 83-3, PID 1480.) But Impact appears to have recorded only three. One of those was "Forget It": a song for which Balk registered a copyright, listing Rodriguez as the author and Gomba as the owner. (R. 83-7, PID 1525.) Importantly, a song titled "Forget It" would later appear on *Cold Fact*, (R. 82-9, PID 1328), and Rodriguez testified that he has written only one song by that name, (R. 83-8, PID 1539).

Nothing in the record indicates that anything else ever came of Balk and Rodriguez's relationship. Instead, at some point in 1967, the year after signing Rodriguez, Balk became an employee of Motown Records, (R. 83-5, PID 1493, 1509), further limiting their relationship. Balk did not renew the recording agreement when it expired in mid-1968. (R. 83-5, PID 1509.) Impact stopped releasing new records. (R. 83-5, PID 1509–10.) Moreover, Balk no longer

3

performed under the management agreement. As he testified, once at Motown he did not manage anyone and "wouldn't even want to." (R. 83-5, PID 1510.)

As for the exclusive songwriter's agreement between Gomba and Rodriguez, some compelling evidence suggests that Balk assigned the agreement to Jobete, Motown's publishing arm. In several communications in the late 1960s, Jobete asserted that it held a valid assignment from Balk. For example, in February 1969, Ralph Seltzer from Jobete wrote this to Rodriguez: "This letter is to formally notify you of the assignment to Jobete Music Company, Inc. by Gomba Music, Inc. of an exclusive writer's contract regarding your services as a writer." (R. 83-16, PID 1715.) Nonetheless, in his deposition, Balk denied that the assignment happened. (R. 83-5, PID 1494.)

But Balk admits that he assigned Gomba's rights to copyrighted material to Jobete. (R. 83-5, PID 1493–94.) Specifically, in December 1967, Gomba assigned to Jobete half of the rights it held to numerous compositions, including Rodriguez compositions. (R. 86-12.) In March 1971, Gomba assigned its remaining interests in those songs to Jobete. (R. 86-13.)

Gomba effectively folded after Balk moved to Motown. Balk did not file an annual report for Gomba in 1969, leading to the state of Michigan voiding the corporation's charter by 1971. (*See* R. 82-4, PID 1253.)

Balk and Rodriguez agree that no financial benefit materialized for Rodriguez under their arrangement. As Balk testified, Rodriguez "never sold anything," and thus it was "probably true" that Rodriguez never received any money. (R. 83-5, PID 1512.) For his part, Rodriguez testified that he never made a penny from Balk: "I got a ride in a Cadillac with him. That's all I got." (R. 83-8, PID 1534–35.)

**B.**

At some point after Balk went to Motown in 1967, though the exclusive songwriter's agreement's term had not expired, Rodriguez ventured off on his own.

Between October 1968 and August 1969, Rodriguez registered with the Copyright Office the nine disputed songs that would later end up in the *Cold Fact* album: "Inner City Blues," "Like Janis," "Jane S. Pitty," "Only Good for Conversation," "I Wonder," "Crucify Your Mind," "Sugar Man, on Prentice," "The Rich Folks Hoax," and "Establishment Blues."[2] (R. 83-13, PID 1660–77.) Rodriguez also registered "Forget It," which Balk had previously registered. (*Id.*) The registrations identify as the claimants and authors "Sandraven, Inc.," "Sixth Prince, Inc.," or "Jesus Rodriguez (Jesse)," the name of Rodriguez's brother. (*Id.*) The registrations do not mention Sixto.

That was not an accident. Rodriguez testified that he formed two corporations— Sandraven in October 1968 and Sixth Prince in January 1969—because, in his words, he wanted to "protect[]" and "save" his compositions and "[t]o keep and retain ownership of my material." (R. 83-10, PID 1584; R. 83-11, PID 1588; R. 83-8, PID 1541.) Rodriguez testified that setting up Sandraven and Sixth Prince was his idea alone and that Defendant Clarence Avant had nothing to do with it. (R. 83-8, PID 1541–42.) Avant similarly testified that he did not set up the two entities. (R. 83-12, PID 1630.)

Before filing many of the registrations, Rodriguez began to collaborate with Mike Theodore and Dennis Coffey, two producers and musicians who ultimately led him to Clarence Avant. According to Theodore and Coffey, sometime in 1969 Theodore got a call from Rainy

---

[2] The initial registration for "Establishment Blues" does not appear to be in the record, but the Court notes that a subsequent assignment of copyright references Jesus Rodriguez as the author and Sixth Prince, Inc. as the party to the transfer. (R. 82-8, PID 1305.)

5

Moore, whom they believed to be Rodriguez's manager. (R. 83-14, PID 1686—87; R. 83-15, PID 1710.) Theodore and Coffey both say that Moore said Rodriguez was free or that Balk had released him. (R. 83-14, PID 1687; R. 83-15, PID 1710.) They also claim that Balk himself told them he thought Rodriguez was "crazy" or "nuts" and that he wanted no further involvement with him. (R. 83-14, PID 1689; R. 83-15, PID 1710.) In early 1969, Theodore and Coffey recorded a demo tape of Rodriguez and sent it to Clarence Avant, hoping he could help "get a deal." (R. 83-14, PID 1688; R. 83-15, PID 1711.)

## C.

Avant apparently liked what he heard and thus tried to sign Rodriguez, but evidence suggests that Avant recognized that Balk's contracts with Rodriguez (and their resulting exclusive relationship) were a potential obstacle to finalizing a deal. In April 1969, Rodriguez's then-attorney, Robert McCall, sent Avant copies of Rodriguez's three contracts with Balk's companies along with a copy of Jobete's February 1969 notice of assignment. (R. 83-17, PID 1717.) McCall wrote the following to Avant:

> Although one single was recorded under the IMPACT agreement in the summer of 1967, no monies were ever received by Mr. Rodriguez. This contract has expired on its face since no options were picked up.
>
> Pursuant to the writer's contract with Gomba Music, Inc., the songs "Slip-away" and "You'd like to admit it," which comprised the above mentioned single, may have been processed by GOMBA but I have no evidence in this regard. In any event, Mr. Rodriguez has received no compensation in the form of royalties or otherwise as a result of the writer's contract.
>
> Regarding the management contract, no bookings were made nor has any compensation been received.
>
> Please advise me of your attorneys' opinion of the contracts and of your decision.

(R. 83-17, PID 1717.)

6

Avant responded that his attorneys had concluded the agreements were "worthless" and that McCall should "write Mr. Balk and Jobete Music and tell them [Rodriguez] is not going to honor the assignment that was made to Jobete Music because the contracts are dormant." (R. 83-18, PID 1719.) Avant suggested taking a "strong stand with Motown and Harry Balk." (*Id.*) He added, "I want Sixto to record for Venture [Avant's record company], therefore, I am willing to take my chances. . . . But first I think you should definitely write all parties concerned and state your clients [sic] position." (*Id.*)

McCall took that advice. In May 1969, Rodriguez signed a "Notice of Breach and Recission," which was on McCall's letterhead and addressed to Harry Balk, Gomba, and Harry Balk Enterprises.[3] (R. 83-19, PID 1723.) The notice stated that Rodriguez considered the management and exclusive writer's agreements breached on the grounds of "non-performance and/or impossibility" and that Rodriguez would therefore not recognize the "alleged assignments" of the exclusive songwriter's agreement. (*Id.*)

> Around a week later, Seltzer responded on behalf of Jobete:
>
> Mr. Balk has shown me the affidavit he received from you in the mail recently. This affidavit is purely and simply a self-service document; and as I am sure your attorney can advise you, is of no force and effect whatsoever. Further, this document in no way can affect any rights which this Company may have to your exclusive service as a songwriter.
>
> As you know, we hold a valid assignment of a contract relating to your exclusive songwriting services.

(R. 83-20, PID 1725.)

McCall forwarded Seltzer's letter to Avant, who replied, "I will proceed by just asking for a recording contract. For your information, I requested a one year contract with two one year

---

[3] McCall wrote to Avant that he also sent the notice to Motown Records. (R. 83-19, PID 1722.)

options. I will, at some later date, speak with Ralph Seltzer regarding the exclusive songwriters contract, hoping to work something out." (R. 83-21, PID 1727.) Avant also wrote that Theodore "plans to start recording sometime in the very near future." (*Id.*)

### D.

*Cold Fact* was recorded in the summer of 1969. (R. 83-14, PID 1704.) In February 1970, through a series of individual contracts, Rodriguez assigned to Interior Music Corp., Avant's publishing company, the rights to each of the disputed songs that would later appear on the album (the copyrights of which had been registered to Jesus Rodriguez, Sandraven, or Sixth Prince). (R. 82-12.) On March 2, 1970, Rodriguez entered a recording agreement with Sussex Records, Avant's record company, and a songwriter agreement with Interior. (R. 83-23; R. 83-24.) Under that songwriter's agreement, Rodriguez assigned Interior rights to his compositions and warranted that he could "vest in [Interior] all the rights herein set forth, free and clear of any and all claims, rights and obligations." (R. 83-24, PID 1748, 1752.)

*Cold Fact* was released that month. Theodore and Coffey produced the album, which was released on Avant's label, Sussex Records. (R. 83-14, PID 1690.) Rodriguez performed the album's 12 songs. (R. 83-14, PID 1690; R. 83-26.) Two songs were credited to Gary Harvey, Mike Theodore, and Dennis Coffey. (R. 83-26.) The 10 other songs were the ones that Rodriguez had previously registered copyrights for, attributing authorship to Sandraven, Sixth Prince, or Jesus Rodriguez. And similar to those registrations, the album credited the 10 songs to either Sixth Prince or Jesus Rodriguez. (R. 83-26.) None were credited to Sixto. (*Id.*)

Rodriguez testified that the decision to credit the songs to Jesus Rodriguez and Sixth Prince was his decision, that he did it to "protect[] my material," and that Avant had nothing to do with it. (R. 83-8, PID 1553.) Similarly, Avant testified that he did not know who made that

8

decision but that he was not involved in it. (R. 83-12, PID 1623–27.) According to Theodore, Avant's involvement was limited to "suppl[ying] the money," and Avant never came to any of the recording sessions. (R. 83-14, PID 1690.)

Balk testified that he was aware that Rodriguez had performed *Cold Fact* and knew of the album's release in 1970, describing it as "common knowledge" and saying "you had to be deaf not to know that it was." (R. 83-5, PID 1498, 1519.) But according to Balk, "Mike Theodore told me that Sixto Rodriguez didn't write all those songs, his brother, Jesus wrote them. I had no reason not to believe him." (R. 83-5, PID 1498.) So at the time, Balk did nothing further to investigate whether Sixto, in addition to performing the songs, was their true author. (R. 83-5, PID 1520.) Contrary to Balk's account, Theodore says that he did not know Rodriguez's first name and did not know who wrote the songs, but he assumed that Rodriguez did. (R. 83-14, PID 1691.) Coffey likewise avers that they referred to Rodriguez by his last name during the recording, he did not even know Rodriguez's first name, and thought Jesus may have been his first name. (R. 83-14, PID 1691; R. 83-15, PID 1712.)

While Balk did nothing to pursue his potential claim, Jobete, which repeatedly claimed to have been the assignee of Gomba's contract with Rodriguez, sent a telegram to Avant dated April 3, 1970: "WE HAVE CURRENT VALID EXCLUSIVE WRITERS' AGREEMENT WITH SIXTO RODRIGUEZ. ALL SONGS PARTIALLY OR WHOLLY CREATED BY HIM ARE OURS FOR PUBLISHING[.]" (R. 83-32, PID 1932.) The record suggests that no one ever followed up though—at least not until Balk filed this lawsuit close to a half-century later.

Balk claims that when *Searching for Sugarman* was released in 2012, he learned for the first time that Sixto Rodriguez was the composer of the *Cold Fact* songs. Believing he was the owner of the songs as a result of the exclusive songwriter's agreement, he filed this suit.

9

**E.**

Balk sued Avant and Interior on May 2, 2014. (R. 1.) His operative second amended complaint has four counts. (R. 39.) Count I asserts a claim of fraud on the copyright office. (R. 39, PID 620.) Count II asserts a claim for a declaratory judgment that Balk owns the rights to the disputed compositions. (R. 39, PID 622.) Count III asserts a claim for "fraudulent concealment/tortious interference with contract and fraud." (*Id.*) Finally, while there is no Count IV, Count V asserts a claim of copyright infringement. (R. 39, PID 624.)

Interior has also filed a third-party complaint against Rodriguez, which asserts two counts. (R. 11.) Count I is a claim that Rodriguez breached his songwriter's agreement with Interior by warranting and representing that he could assign rights to the *Cold Fact* compositions "free and clear of any and all claims, rights and obligations whatsoever." (R. 11, PID 44–45.) Count II is a claim that Rodriguez breached the same agreement by failing to cooperate with Interior in this litigation. (R. 11, PID 46.)

All parties have moved for summary judgment. Balk filed a motion for partial summary judgment on the issues of whether he owns the rights to the disputed songs and whether his claims are timely. (R. 82.) Defendants filed a motion for summary judgment seeking dismissal as a matter of law on those same issues. (R. 83.) Rodriguez also filed his own motion for summary judgment seeking dismissal of the third-party complaint against him. (R. 81.)

**II.**

As each party has moved for summary judgment, the standards are two-fold. To the extent a party seeks summary judgment on a claim or defense for which it does not bear the burden of persuasion at trial, the moving party may discharge its initial summary-judgment burden by "pointing out to the district court . . . that there is an absence of evidence to support

10

[the non-moving party's] case." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). If the moving party does so, the non-moving party "must come forward with specific facts showing that there is a genuine issue for trial." *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The Court must then determine whether the evidence presents a sufficient factual disagreement to require submission of the non-moving party's claims to a factfinder, or whether the evidence is so one-sided that the moving party must prevail as a matter of law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). In making this determination, the Court views the evidence, and any reasonable inferences drawn from the evidence, in the light most favorable to the non-moving party. *See Matsushita*, 475 U.S. at 587.

To the extent a party seeks summary judgment on a claim or defense for which it has the burden of persuasion, the moving party's "initial summary judgment burden is higher in that it must show that the record contains evidence satisfying the burden of persuasion and that the evidence is so powerful that no reasonable jury would be free to disbelieve it." *Surles v. Andison*, 678 F.3d 452, 455–56 (6th Cir. 2012) (internal quotation marks and citations omitted). In making this determination, the Court views the evidence, and any reasonable inferences drawn from the evidence, in the light most favorable to the non-moving party. *See Matsushita*, 475 U.S. at 587.

## III.

### A.

Balk and the Defendants have each moved for summary judgment on the issue whether Balk's claims—filed over 40 years after *Cold Fact's* release—are timely.

#### 1.

The Court begins with Balk's state-law claim. Count III of Balk's second amended complaint asserts what he labels as a claim for "Fraudulent Concealment/Tortious Interference

with Contract and Fraud." (R. 39, PID 622.) Balk invokes fraudulent concealment to toll the otherwise long-expired limitation periods applicable to his fraud and tortious interference with contract claims. Michigan's fraudulent concealment statute provides:

> If a person who is or may be liable for any claim fraudulently conceals the existence of the claim or the identity of any person who is liable for the claim from the knowledge of the person entitled to sue on the claim, the action may be commenced at any time within 2 years after the person who is entitled to bring the action discovers, or should have discovered, the existence of the claim or the identity of the person who is liable for the claim, although the action would otherwise be barred by the period of limitations.

Mich. Comp. Laws § 600.5855. Under this statute, "[t]he plaintiff must prove that the defendant committed affirmative acts or misrepresentations that were designed to prevent subsequent discovery. Mere silence is insufficient." *Sills v. Oakland Gen. Hosp.*, 559 N.W.2d 348, 352 (Mich. Ct. App. 1996) (citation omitted).

Some evidence supports Balk's claim that Interior and Avant tried to conceal the fact that Rodriguez authored the disputed *Cold Fact* songs. For one, the evidence suggests that before the album's release, Avant was well aware of Rodriguez's exclusive agreement with Balk (even if he doubted the agreement's continued validity). In particular, Rodriguez's attorney sent Avant a copy of the agreement in February 1969. (R. 83-17.) While Avant wrote that his attorneys had concluded the agreement was "worthless," he also wrote, "I want Sixto to record for Venture [Avant's record company], therefore, I am willing to take my chances." (R. 83-17, PID 1719.) The evidence suggests that Defendants tried to minimize the chance of a potential dispute though. Second, when *Cold Fact* was released, the album credited songs written by Sixto Rodriguez to Jesus Rodriguez and Sixth Prince. Notices of use that Interior filed with the copyright office the same month the album was released also misattributed authorship of the *Cold Fact* songs to Jesus Rodriguez, Sixth Prince, or Sandraven. (R. 86-22.) Granted, both Avant

12

and Rodriguez testified that Avant had nothing to do with the decision to attribute the songs to others—either in the initial copyright registrations (R. 83-12, PID 1630; R. 83-8, PID 1541–42) or on the album itself (R. 83-8, PID 1553; R. 83-12, PID 1623–27). But Avant also testified that Rodriguez told him that he wrote the relevant songs. (R. 83-12, PID 1646.) And the songs ultimately appeared on an album that Avant financed, were released on Avant's record label, and published by Avant's publishing company, Interior. So Defendants' protestations of innocence in helping to hide the true author of the *Cold Fact* songs are debatable.

But to withstand summary judgment here, Balk must do more than bring forth evidence showing that Defendants acted to conceal Rodriguez's authorship of the disputed songs. As this Court has observed, "The key question when fraudulent concealment is alleged is whether a plaintiff's failure to discover the cause of action was due to his own neglect or due to the defendant's concealment." *Gomba Music, Inc. v. Avant*, 62 F. Supp. 3d 632, 647 (E.D. Mich. 2014). "Thus, the question of whether a plaintiff has sufficient knowledge to bring a claim is not based on 'whether the plaintiff has knowledge of sufficient facts to prevail on a claim, but whether the plaintiff has knowledge of sufficient facts to cause a reasonable person to pursue an investigation that could uncover the evidence needed to lead to an ultimate victory.'" *Estate of Abdullah ex rel. Carswell v. Arena*, No. 12-14766, 2014 WL 1304725, at *5 (E.D. Mich. Mar. 28, 2014) (quoting *Moll v. Abbott Laboratories*, 506 N.W.2d 816, 826 n.25 (Mich. 1993)), *aff'd*, 601 F. App'x 389 (6th Cir. 2015), *cert. denied sub nom. Carswell v. Arena*, 136 S. Ct. 357, 193 L. Ed. 2d 289 (2015). "In other words, a plaintiff is sufficiently apprised of a cause of action if he or she is aware of a 'possible cause of action.'" *Id.* (quoting *Doe v. Roman Catholic Archbishop of the Archdiocese of Detroit*, 692 N.W.2d 398, 403 (Mich. Ct. App. 2005)). Furthermore, Balk "must be held chargeable with knowledge of the facts, which [he] ought, in

13

the exercise of reasonable diligence, to have discovered." *See Barry v. Detroit Terminal R.R. Co.*, 11 N.W.2d 867, 870 (Mich.1943); *see also CH Holding Company v. Miller*, No. 293686, 2011 WL 5008573, at *5 (Mich. Ct. App. Oct. 20, 2011) (per curiam).

When ruling on Defendants' motion to dismiss, the Court noted that the question of whether Balk should have discovered the state-law claim he now brings was a "close question." (R. 35, PID 512.) Discovery has changed that. Numerous red flags should have put Balk on notice of his possible fraud and tortious interference with contract claims by the time *Cold Fact* was released in March 1970.

To start, the evidence suggests that Balk knew in 1969 that Rodriguez no longer recognized the validity of their songwriter's agreement. (R. 83-19, PID 1723.) Although Balk denies recalling that he received Rodriguez's letter disavowing the agreement, (R. 83-5, PID 1496), he offers no explanation for why Jobete was able to respond to Rodriguez a few days later, asserting that Balk had passed along Rodriguez's affidavit, (*see* R. 83-20, PID 1725).

Second, at the time of *Cold Fact's* release, Balk was well aware that Rodriguez—a singer and songwriter he claims to have still been under an exclusive songwriter agreement with at the time—at the very least performed the disputed songs. (*See* R. 83-5, PID 1498, 1519.)

Third, the album's cover itself further reinforces the conclusion that Balk was notice of his potential claims. The album cover credited "Sixth Prince"—which notably has the same first syllable as "Sixto"—or "Jesus Rodriguez" for 10 of the songs. Balk was unfamiliar with the name "Sixth Prince," but he acknowledged that it could have been a pseudonym. (R. 83-5, PID 1503.) Indeed, Balk had used pseudonyms before and was aware that performers commonly used such aliases. (R. 83-5, PID 1502.) Balk had even used a pseudonym for Rodriguez: on the sole

14

record Balk released for Rodriguez, he attributed Rodriguez's songs to "Rod Riguez" instead of Sixto Rodriguez. (R. 83-5, PID 1501.)

Fourth, and perhaps the most telling sign that something was amiss is that one of the songs that appeared on *Cold Fact*, "Forget It," was the same title and is the same song as one of the five Rodriguez songs for which Balk had previously obtained a copyright during the course of their arrangement. Gomba, Balk's company, registered a copyright for "Forget It" in 1967. (R. 83-7, PID 1526.)

The Court finds unpersuasive Balk's arguments for why this song's presence on the album should not have put him on any notice of a potential claim. For instance, he points out that he transferred half of his interest in the song to Jobete before the album's release. (R. 86, PID 1963.) But that means he still retained a one-half interest in the song at the time of the album's release. Balk also claims that "Forget It" should not have put him on notice because his secretary handled Gomba's copyright registrations. (*Id.*) But he acknowledged in his testimony that it "looks like" his own signature on the copyright registration for "Forget It," and comparing his signature to the three contracts he signed with Rodriguez, the Court agrees with Balk. (*See* R. 83-5, PID 1504; R. 83-7, PID 1528; R. 83-2; R. 83-3; R. 83-4.) Finally, Balk points to the fact that "Forget It" is not a subject of this litigation (*id.*), as he assigned his remaining interest in the song to Jobete by 1971, (*see* R. 86-13). But whether he has or had any financial interest in, or administrative role regarding "Forget It" is irrelevant. Rather, the critical issue here is that one of the few Rodriguez compositions that Balk recorded was on the very album he now says he had no reason to believe contained any Rodriguez compositions.

Finally, the album's cover provided a trail to one source of publicly available information indicating that Sixto Rodriguez—not Sixth Prince or Jesus Rodriguez—was the true author. In

15

particular, the album's label stated, "All tunes published by Interior Music (BMI)." (R. 83-26, PID 1771.) BMI is a "performing rights organization" that acquires performance rights from music writers and publishers, grants licenses for those rights, and then collects and distributes licensing fees. (R. 83-27, PID 1775.) The 10 songs Rodriguez composed for *Cold Fact* were registered with BMI in May and September of 1970, listing him as the author.[4] (R. 83-29.) According to Avant's expert, who was employed by BMI from 1957–68 and was familiar with BMI's registration procedures from that time, this information would have been available to anyone who inquired with BMI. (R. 83-30, PID 1811–12.) Balk's expert agrees that BMI would have provided Balk with this information if he had inquired. (R. 92-2, PID 2413.)

Although Balk's expert maintains that "[i]t would be quite unusual for anyone to consult BMI's records for a specific song unless they had reason to believe they owned an interest in the song" (R. 86-25, PID 2188), even he admitted in his deposition that Balk should have done more to pursue his potential claim. Balk's expert testified: "If you are asking me should Mr. Balk have had a suspicion, reason to check further, I think the answer based on all of this would be, in my opinion, yes." (R. 92-2, PID 2414.) Indeed, shortly after *Cold Fact's* release, even Jobete—a company that Balk now claims had no contractual interest in the disputed songs—sent a telegram to Avant, stating that it held the rights to anything written by Rodriguez. (R. 83-32.)

Balk confirmed in his testimony that he did nothing to investigate whether Rodriguez was the true author of *Cold Fact*'s songs. (R. 83-5, PID 1520.) Indeed, he never even asked Sixto. He never asked Jesus Rodriguez. He did nothing to learn about Sixth Prince. Strikingly, Balk's attorneys have made repeated representations to the Court that Balk at the very least looked at

---

[4] For example, the registration information includes a "W" next to Sixto Rodriguez's name and a "P" next to Interior's name. (R. 83-29, PID 1782.) According to Defendants' expert, this indicates that Rodriguez was the writer and Interior the publisher. (R. 83-30, PID 1811.)

the album when *Cold Fact* was released. Balk's attorneys made such a representation in the first amended complaint (R. 15, PID 112), the second amended complaint (R. 39, PID 615), in a brief opposing Defendants' motion to dismiss (R. 21, PID 259–60), and in the oral argument for that motion, (R. 83-31, PID 1908). But during his testimony, Balk at first appeared to deny doing even that:

> Q: And did you get a copy of [*Cold Fact*]?
>
> A: Of course not.
>
> . . .
>
> Q: I'm asking did [Mike Theodore] give you a copy. I'm asking did you obtain a copy of it?
>
> A: No.
>
> Q: You never obtained a copy of the album?
>
> A: No. It had nothing to do with Sixto Rodriguez. No need for me to get involved in that. I had other things I was busy doing.

(R. 83-5, PID 1498.) Later, Balk backpedaled a bit. Asked whether he reviewed the album's credits, Balk said, "I might have just glanced through them. There was no reason for me to do that. . . . I might have. I don't remember." (R. 83-5, PID 1499.)

Regardless of whether Balk reviewed the album, any reasonable person in his shoes would have, and he is thus chargeable with knowledge of its contents—including that one of the only songs he ever published for Rodriguez was on the album, performed by Rodriguez but credited to someone else.

Against this plethora of evidence, Balk relies almost exclusively on one fact to show he was *not* on notice of a possible claim. He claims that Mike Theodore told him that Rodriguez's brother wrote the songs on *Cold Fact*, and he relied on that representation: "Mike Theodore told

me that Sixto Rodriguez didn't write all those songs, his brother, Jesus wrote them. I had no reason not to believe him." (R. 83-5, PID 1498.) Balk could not identify when that conversation even happened—before or after the album's release—or whether they spoke in person. (R. 83-5, PID 1500, 1519.) And even assuming the conversation happened, that was no excuse for Balk to do nothing further and sit on his claim for close to a half-century in the face of all of the red flags at the time of the album's release. What's more, Theodore's testimony implicitly disputes whether this conversation happened, making the Court wonder why Balk thought it appropriate to file his own summary-judgment motion on this issue. Specifically, Theodore testified that he had no idea who Jesus Rodriguez was, and while he did not know Sixto's first name, he assumed that the Rodriguez who contracted with Balk wrote the songs. (R. 83-14, PID 1691.) Theodore also testified that while he mentioned the album to Balk after its release, Balk simply reiterated that he wanted nothing to do with Rodriguez. (R. 83-14, PID 1688.)

In sum, the undisputed evidence leaves no room for a reasonable fact finder to conclude that Defendants concealed information in a way that would have prevented a reasonable person acting with reasonable diligence from discovering Balk's state-law claim at least by 1970. Because of numerous red flags, Balk should have been aware of his possible claims in March 1970. Balk had viable avenues to pursue or investigate his claims yet did nothing—at least not until decades later once it became apparent there was finally money to be made from Rodriguez. Thus, Defendants are entitled to judgment as a matter of law in their favor.

## 2.

The claim accrual standards under federal copyright law warrant a different outcome. As noted, Count II of the Second Amended Complaint is a claim for declaratory judgment that Balk is the owner of the disputed *Cold Fact* compositions. (R. 39, PID 622.) "Under the Copyright

Act, a claim for copyright infringement or ownership has a three-year statute of limitations."
*Roger Miller Music, Inc. v. Sony/ATV Publ'g, LLC*, 477 F.3d 383, 389 (6th Cir. 2007) (citing 17
U.S.C. § 507(b)). Claims for infringement and ownership are subject to different accrual
standards. "A copyright-infringement claim 'accrues when a plaintiff knows of the potential
violation or is chargeable with such knowledge.'" *Id.* at 390 (quoting *Bridgeport Music, Inc. v.
Rhyme Syndicate Music*, 376 F.3d 615, 621 (6th Cir.2004)). This is generally known as the
"discovery rule." *See, e.g.*, *Chicago Bldg. Design, P.C. v. Mongolian House, Inc.*, 770 F.3d 610,
614 (7th Cir. 2014). In contrast, "[a] claim for copyright ownership 'is barred three years from
'plain and express repudiation' of [ownership].'" *Roger Miller Music, Inc.*, 477 F.3d at 390
(quoting *Ritchie v. Williams*, 395 F.3d 283, 289 n.5 (6th Cir. 2005).

The Court has reason to question whether the plain and express repudiation rule applies
here instead of the discovery rule. When the Sixth Circuit adopted the rule, the Court noted that
it applied to ownership claims between co-authors or others in "close relationships." *See Ritchie*,
395 F.3d at 289 n.5. The Court has expressly extended the rule to only one such "close
relationship"—"those who transfer copyright ownership via contract." *Id*. The Court has not
extended the rule to a case like this one, where the claim is between a party who has a purported
contractual right to copyrights and a non-party to that contract. And in this case, it is not even
clear to the Court who would have had to have expressly repudiated Balk's rights for his claim to
accrue—Rodriguez or Defendants.

There may be a good reason to not apply the rule beyond parties in close relationships,
such as co-authors or parties in contractual relationships. As the Ninth Circuit has remarked
(though without deciding the issue), "Extending [the plain and express repudiation] accrual rule
to encompass claims against those who are not in a close relationship could introduce uncertainty

19

into the enforcement of copyrights and require copyright holders to file suit against any third party that might be deemed to have repudiated the copyright owner's title." *Seven Arts Filmed Entm't Ltd. v. Content Media Corp. PLC*, 733 F.3d 1251, 1256 (9th Cir. 2013).

Finally, at least one court has—perhaps more appropriately—characterized plain and express repudiation as simply one way of demonstrating that a claimant knew or should have known of a claim under the traditional discovery rule. *See Kwan v. Schlein*, 634 F.3d 224, 228 (2d Cir. 2011) ("An ownership claim accrues only once, when 'a reasonably diligent plaintiff would have been put on inquiry as to the existence of a right.' . . . Under this rubric, any number of events can trigger the accrual of an ownership claim, including '[a]n express assertion of sole authorship or ownership.'" (citations omitted)).

Nonetheless, the Court believes it must apply the express repudiation rule of accrual here. The last time the Sixth Circuit considered this issue, it characterized plain and express repudiation as a *requirement* for copyright ownership claim accrual. *See Roger Miller Music, Inc.*, 477 F.3d at 390 ("The district court's conclusion that the Appellants' ownership claim is not time-barred is correct because there was no plain and express repudiation of ownership by Sony or Appellants as required[.]"). The Court made no mention of the rule's limitation to disputes between parties in close relationships. The Seventh Circuit has also recently adopted the rule without mentioning its limitation to parties in close relationships or co-authors. *See Consumer Health Info. Corp. v. Amylin Pharm., Inc.*, 819 F.3d 992, 997 (7th Cir. 2016) ("We're persuaded by the unanimous line of cases from our sister circuits and now hold that when the gravamen of a copyright suit is a question of copyright ownership, the claim accrues when the ownership dispute becomes explicit—that is, when the claimant has notice that his claim of ownership is repudiated or contested.").

Additionally, even if the rule was limited to ownership disputes stemming from "close relationships," the relationship between Avant and Balk may well qualify. True, Balk and Avant did not directly face each other in a contractual arrangement. Still, assuming that Balk did not assign the Gomba/Rodriguez exclusive songwriter agreement to Jobete or the agreement was not otherwise terminated (more on that later), Balk and Avant had competing contracts covering the same exclusive rights to Rodriguez's compositions when *Cold Fact* was released. Apparently aware of this possible dilemma, Avant wrote that he would "take my chances." (R. 83-18, PID 1719.)

On this record, no one plainly or expressly repudiated Balk's ownership rights to the *Cold Fact* compositions by the time of the album's release. Rodriguez sent a notice to Balk in May 1969, stating that he no longer recognized the validity of the exclusive songwriter's agreement with Gomba. By implication, that would seem to be plain and express repudiation of Balk's rights to current and future compositions from Rodriguez. (R. 83-19, PID 1723.) But by that time, Rodriguez had already filed copyright registrations for several of the songs that would end up on *Cold Fact*, misattributing authorship to Jesus Rodriguez and Sixth Prince. (R. 83-13, PID 1660–77.) His letter to Balk did not reference those songs. Defendants' use of alias authors in the album's credits, assignments of the copyrights from Rodriguez to Interior (R. 82-12; 82-14; 82-8), and various notices of use, (R. 86-12) also suggests that they sought to circumvent Balk's claim to ownership. Thus, it is hard to say that Balk's ownership rights were plainly and expressly repudiated. *See Roger Miller Music, Inc.*, 477 F.3d at 390 (holding that audit letter disclosing underpayment of royalties did not qualify as plain and express repudiation because the letter "does not address ownership of the renewal copyrights and does not clearly claim

21

ownership over those copyrights"). Accordingly, Defendants are not entitled to summary judgment as to the timeliness of Balk's copyright ownership claim.

**3.**

Yet another result is warranted for Balk's copyright infringement claim. Again, ownership and infringement claims are subject to different accrual periods. As noted, "[a] copyright-infringement claim accrues when a plaintiff knows of the potential violation or is chargeable with such knowledge." *Roger Miller Music, Inc.*, 477 F.3d 383 at 390. However, "each new infringing act causes a new three year statutory period to begin." *Id.* (quoting *Ritchie*, 395 F.3d at 288 n.5). So, for example, in *Roger Miller Music, Inc.*, the Court found a 2004 ownership claim timely because there had been no plain and express repudiation of ownership. *Id.* at 390. Nonetheless, because a 1995 letter put the claimant on notice that the defendant had been exploiting the disputed songs, the Court held that the infringement claim was untimely for all but the three-year period immediately preceding the complaint. *Id.*

When ruling on Defendants' motion to dismiss, this Court discussed the lack of controlling authority on what makes a party "chargeable" with knowledge of a potential claim. *See Gomba Music, Inc. v. Avant*, 62 F. Supp. 3d 632, 645 (E.D. Mich. 2014). Other courts have applied an "inquiry notice" standard, meaning a party is chargeable with knowledge when there are "storm warnings" of possible culpable conduct that give cause for further investigation. *See Design Basics, LLC v. Chelsea Lumber Co.*, 977 F. Supp. 2d 714, 724 (E.D. Mich. 2013) (citing cases).

Applying the inquiry notice standard here, for the same reasons discussed in connection with Balk's state law claims, he was chargeable with knowledge of a possible infringement claim decades ago. Although short of a lightning strike, plenty of storm warnings surrounded *Cold*

*Fact's* release and suggested that Sixto Rodriguez had composed the songs. Yet Balk undertook no diligent investigation and took no action until he realized money could be made. *See Carrier Corp. v. Outokumpu Oyj*, 673 F.3d 430, 446 (6th Cir. 2012) (noting the general requirement that for fraudulent concealment claims under federal law a "plaintiff's due diligence until discovery of the facts" is one of the elements). As such, his infringement claim extends only to the alleged infringement as of May 2, 2011—three years prior to his filing of the complaint.

### 4.

This leaves Count I of the Second Amended Complaint, which asserts a claim of fraud on the copyright office. (R. 39, PID 620.) As this Court has noted, courts differ on whether fraud on the copyright office is a proper cause of action or rather an affirmative defense. *Gomba Music, Inc. v. Avant*, 62 F. Supp. 3d 632, 642–43 (E.D. Mich. 2014). To the extent courts have held that fraud on the copyright office is a proper cause of action, the Court is unaware of any authority addressing the applicable claim accrual rule. But the Court sees no reason to deviate from the traditional discovery rule. Accordingly, for the same reasons discussed regarding Balk's state-law claims, Balk's fraud on the copyright office claim accrued when *Cold Fact* was released. It is therefore untimely.

* * *

In sum, Balk's claim for a declaration that he owns the disputed copyrights and his claim for infringement during the three years before he filed his complaint are not subject to dismissal on timeliness grounds. But timeliness is not the only issue here. Another issue warrants dismissal of Balk's claims as a matter law: his lack of any ownership interest in the disputed songs.

**B.**

Balk and the Defendants have both moved for summary judgment on the issue of whether Balk has rights to the *Cold Fact* compositions.[5] Among other arguments, Defendants contend that the undisputed evidence establishes that one or both parties abandoned the exclusive songwriter's agreement between Gomba and Rodriguez. The Court agrees.

A panel of the Michigan Court of Appeals recently explained the law of abandonment under principles of Michigan contract law (the exclusive songwriter's agreement between Gomba and Rodriguez contains a Michigan choice of law provision (R. 82-3, PID 1251)):

> A contract may be "'effectually rescinded by the actions of the parties where they mutually abandon all further performance under it, and treat it as at an end, neither seeking to hold the other to any accountability under it.'" *Young v. Rice,* 234 Mich. 697, 700; 209 NW 43 (1926), quoting Black on Rescission, § 1251 *et seq.* "The abandonment of a contract is a matter of intention to be ascertained from the facts and circumstances surrounding the transaction from which the abandonment is claimed to have resulted." *Dault v. Schulte,* 31 Mich. App 698, 701; 187 NW2d 914 (1971), quoting 17A Am Jur 2d, Contracts, § 543. "An abandonment of a contract need not be express but may be inferred from the conduct of the parties and the attendant circumstances. A contract will be treated as abandoned when acts of one party, inconsistent with the existence of the contract, are acquiesced in by the other party." *Dault,* 31 Mich. App at 701.

*Clapper v. Zochowski*, No. 313133, 2014 WL 3844027, at *5 (Mich. Ct. App. Aug. 5, 2014) (per curiam).

---

[5] The parties also dispute whether Balk assigned the songwriter's agreement from Gomba to Jobete. A significant amount of evidence suggests that happened. For instance, Jobete asserted in writing several times that it held an assignment or otherwise had rights to Rodriguez's music. (R. 83-16; R. 83-20; 83-32.) But Balk testified that he did not assign the agreement to Jobete, (*see* R. 83-5, PID 1494), and no written agreement evidencing the alleged assignment is in the record. As Defendants point out, Balk's testimony is self-serving. But that does not mean the Court is free to reject it: "A court may not disregard evidence merely because it serves the interests of the party introducing it." *Harris v. J.B. Robinson Jewelers*, 627 F.3d 235, 239 (6th Cir. 2010). Thus, standing alone, the purported assignment does not entitle Defendants to judgment as a matter of law.

Defendants have pointed to substantial evidence establishing abandonment, and Balk has not rebutted with evidence sufficient to create a genuine issue of material fact.

Balk twice effectively acknowledged in his deposition that once he became employed by Motown Records in 1967, he was no longer allowed to operate Gomba, his publishing company that was a party to the songwriter's agreement. In other words, his new employer effectively prohibited him from performing under the prior songwriter's agreement.

At one point, Balk testified as follows:

Q: And Motown would not—once you went to work for Motown, you were not permitted to operate a publishing company in competition with Jobete; is that correct?

A: I think that's why, yes.

Q: That's why you signed—

A: I believe so.

Q: You have got to let me finish the question, sir. Because you couldn't operate a publication company in competition with Motown and Jobete, that's the reason you assigned the Gomba material to Jobete?

A: Yes.

(R. 83-5, PID 1493.)

At another point, Balk elaborated further:

Q: So according to this document, in 1967 you assigned one-half interest in all of these copyrighted songs to Jobete. Why did you do that?

A: Because I couldn't have a publishing company working for Motown. They had their own publishing company.

Q: So in the time that you were working with Motown, you couldn't really operate Gomba as a publishing company because you would have been in competition?

25

> A: You can't work for Motown and find a song and put it in your publishing company because they had their own publishing company. It's a conflict of interest.
>
> Q: So even if you found a song from a songwriter that you were interested in that hadn't been recorded yet, you would have to give that over to Jobete?
>
> A: Yes.

(R. 83-5, PID 1494.) In December 1967, Gomba assigned to Jobete half of the rights it held to numerous compositions, including Rodriguez's. (R. 86-12.) Within a few years, Gomba effectively folded: Balk did not file an annual report for Gomba in 1969, leading the state of Michigan to void the corporation's charter by 1971. (*See* R. 82-4, PID 1253.)

Nonetheless, in a post-deposition affidavit submitted in response to Defendants' summary-judgment motion, Balk changes course and now claims that he simply was not allowed to take on new business once at Motown:

> As a condition of my employment [with Motown], I agreed not to compete with Motown or its publishing companies, but only in regards to signing new artists during the term of my employment with Motown.
>
> Nothing in the terms and conditions of my employment with Motown Records affected mine nor Gomba Music's then-existing contractual rights and obligations as music publishers.

(R. 86-17, PID 2100.) But Balk's testimony that he could not operate a publishing company once at Motown left no room for this caveat, and Balk cannot create a fact issue by submitting an affidavit that contradicts his own testimony. *See Reid v. Sears, Roebuck and Co.*, 790 F.2d 453, 460 (6th Cir. 1986).

Balk's acquiescence to Rodriguez's notice of rescission also shows abandonment. Specifically, Rodriguez, through his attorney, wrote the following to Balk in May 1969:

> You are hereby notified that the contracts entered into between you and the undersigned on July 25, 1966 for an Exclusive Writer Agreement and Management Agreement with the undersigned are considered breached by you

26

> upon the grounds of non-performance and/or impossibility of performance and are therefore rescinded effective November 4th, 1968 at which time the undersigned had knowledge and reason to believe that you were under the employ of MOTOWN RECORDS and JOBETE MUSIC COMPANY, INC., and that said [entities] had prepared contracts between them and the undersigned of a similar nature."

(R. 83-19, PID 1723.) To this, Balk did not respond (even though Jobete thought a response necessary).

And nothing in the record suggests that he did any further business with Rodriguez. According to the unrebutted testimony of two of his colleagues, Theodore and Coffey, this was by design: Balk said that at the time he wanted nothing to do with Rodriguez because he thought Rodriguez was crazy or nuts. (R. 83-14, PID 1689; R. 83-15, PID 1710.) And as discussed, despite all of the red flags suggesting that Rodriguez may have authored the songs on *Cold Fact*, Balk failed to investigate or take any action to discover his possible claim. Moreover, as also noted, unlike Jobete, Balk asserted no claim to Rodriguez's compositions when the album was released.

The only evidence that Balk cites to suggest that he did not abandon the contract does not help him. In particular, in his response to Defendants' summary-judgment motion, Balk argues that he "performed under the Gomba Songwriter Agreement in regard to the Sixto songs that were already recorded and copyrighted in 1967." (R. 86, PID 1956.) But he cites evidence specific to Jobete, not himself. As Balk argues, "Jobete was performing the administration of the five Sixto compositions that were then already recorded and copyrighted pursuant to the Rodriguez Agreements" and that "[t]here is no evidence that Jobete was not properly administering these compositions." (*Id.*) As previously noted, Balk assigned half of the rights he had to several of Rodriguez's compositions to Jobete prior to *Cold Fact's* release and the remaining half afterward. The fact that Jobete, not Balk, assumed responsibility for

27

administering the copyrights to these songs during the time that Balk still had a one-half interest does nothing to rebut the evidence that he abandoned the songwriter's agreement.

At oral argument, Balk's counsel took a different approach. He argued that Balk's only role under the songwriter's agreement was to sit back and collect and distribute royalties, and that retaining a fifty percent interest in Rodriguez's songs enabled him to do that. But no evidence suggests that the relevant songs earned any royalties: the undisputed evidence establishes that Rodriguez never received a penny from Balk. Even if Balk's retention of the one-half interest reflected an intent to continue performing under songwriter's contract, that was short-lived: he assigned all of his remaining interests in Rodriguez's songs to Jobete in March 1970, several months before the written term of the songwriter's agreement expired. (*See* R. 86-13.) So if Balk's only role under the agreement was to sit back and collect royalties, it is beyond dispute that he not only *did not* do that but also *could not* do that during the last months of the agreement's written term. Thus, Balk's admitted role under the agreement was essentially nothing, reinforcing the conclusion (and evidence) that he abandoned it.

In sum, no genuine issue of material fact remains on the issue of whether the exclusive songwriter's agreement can presently give Balk rights to the *Cold Fact* compositions. A significant amount of evidence establishes that Balk and Rodriguez abandoned the agreement before the album's release, and Balk has put forth no evidence to the contrary. Accordingly, summary judgment is warranted in Defendants' favor on all of Balk's claims. Because he has no ownership rights to the disputed songs, he has no basis to assert his ownership, infringement, and fraud claims under the Copyright Act.

28

**IV.**

This leaves Rodriguez's motion for summary judgment regarding Defendants' third-party complaint against him.

First, Rodriguez says that he is entitled to judgment as a matter of law as to Interior's claim that he breached warranties and representations made in his songwriter's agreement with Interior—contingent on Balk establishing that Defendants knew that Rodriguez was making a faulty warranty. (R. 81, PID 1133.) Throughout this litigation, Defendants have contended that this claim is a pure derivative liability claim, one that simply "seeks to transfer to Rodriguez [Interior's] liability for money damages claimed by Balk." (*See* R. 74, PID 1040.) But because Balk's claims will be dismissed, there will be no liability to transfer to Rodriguez. As such, the Court will dismiss Interior's breach of warranty claim as moot.

Second, Rodriguez says he is entitled to judgment as a matter of law as to Interior's claim that Rodriguez has failed to cooperate in this litigation. (R. 81, PID 1133.) Rodriguez's exclusive songwriter's agreement with Interior had a clause providing that Rodriguez "will at [Interior's] request, cooperate fully with [Interior] in any controversy which may arise or litigation which may be brought concerning [Interior's] rights and interests obtained hereunder." (R. 83-24, PID 1761.)

Interior's claim that Rodriguez failed to cooperate is not a third-party claim, as Rodriguez's liability for this claim does not depend on the outcome of Balk's claims. *See Am. Zurich Ins. Co. v. Cooper Tire & Rubber Co.*, 512 F.3d 800, 805 (6th Cir. 2008). So the Court will not dismiss the claim on that basis.[6]

---

[6] The failure-to-cooperate claim, which is not a third-party claim, came before the Court in this lawsuit only by virtue of its joinder to the breach-of-warranty claim, which is a third-party. Now that the third-party breach-of-warranty claim will be dismissed, the Court has

29

Furthermore, a genuine issue of material fact remains as to whether Rodriguez cooperated to the extent called for in the agreement. Some communications show that Rodriguez's prior lawyers, Joel Martin and Mark Levinson, have been less than helpful to Interior. Before the case was filed, after Defendants' counsel requested non-redacted versions of certain communications, Levinson wrote, "If your client wants to know what else is contained in these and other documents that he wrote or signed, I suggest he should find them in his own files." (R. 89-13, PID 2336.) Other communications show that Martin and Levinson helped Balk prepare for litigation against Defendants. For example, an email shows that Levinson commented on a draft cease and desist letter, the final version of which Balk's attorney sent to Avant's attorney. (R. 89-16, PID 2347; R. 89-17, PID 2352.) Levinson and Martin were also copied on communications regarding drafting and revising Balk's initial complaint. (R. 89-18, PID 2355; 89-19, PID 2366.) Once the case was filed, communications also illustrate that Levinson and Martin were involved in drafting the amended complaint. (R. 89-21, PID 2371–76.) Thus, despite Rodriguez's participation in discovery, a reasonable jury could find that he did not cooperate with Interior as contemplated by the parties' agreement.

Finally, Rodriguez asks the Court to enter an order limiting the amount of damages to royalties, as his agreement with Interior says that the costs and damages of claims against Interior regarding a relevant composition "shall be deemed an advance against any royalties payable to" Rodriguez under the agreement. (R. 83-24, PID 1761.) But Rodriguez has pointed to nothing suggesting the parties intended this provision to be an exclusive remedy. *See Short v. Hollingsworth*, 289 N.W. 158, 159 (Mich. 1939) ("If it appears to have been the intention that

---

reservations about the procedural propriety of retaining the failure-to-cooperate claim as part of this case. But Rodriguez makes no argument for dismissal on such grounds.

the remedy specified in the contract should be exclusive, the rights of the parties will be controlled thereby.").

## V.

For the reasons discussed, Balk's motion for partial summary judgment (R. 82) is DENIED, Defendants' motion for summary judgment (R. 83) is GRANTED, and Balk's second amended complaint (R. 39) is DISMISSED. Additionally, Rodriguez's motion for summary judgment (R. 81) is GRANTED IN PART and DENIED IN PART, and Count I of the third-party complaint (R. 11) is DISMISSED.

SO ORDERED.

                                              s/Laurie J. Michelson_____
                                              LAURIE J. MICHELSON
Dated: December 6, 2016                       U.S. DISTRICT JUDGE

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on December 6, 2016.

                                              s/Keisha Jackson_____
                                              Case Manager